ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2016-Aug-19 14:30:18
60CV-15-5690
C06D06 : 48 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## SIXTH DIVISION

**ROBERT STEINBUCH**                                      **PLAINTIFF**

**v.**                          **Case No. 60CV-15-5690**

**UNIVERSITY OF ARKANSAS, aka**                          **DEFENDANTS**
**UNIVERSITY OF ARKANSAS—LITTLE ROCK**

**THE TRUSTEES OF THE UNIVERSITY OF ARKANSAS;**

**MICHAEL SCHWARTZ, IN HIS OFFICIAL AND PERSONAL CAPACITY;**

**THERESA BEINER, IN HER OFFICIAL AND PERSONAL CAPACITY;**

**ZULMA TORO, IN HER OFFICIAL CAPACITY;**

**JOANN MAXEY, IN HER OFFICIAL CAPACITY**

---

### PLAINTIFF'S FOURTH AMENDED AND THIRD SUPPLEMENTAL COMPLAINT

---

1. This case is an appeal from denial of rights guaranteed under the Arkansas Freedom of Information Act (AFOIA), pursuant to Ark. Code Ann. § 25-19-107(a); a claim of violation of the AFOIA anti-retaliation statute, Ark. Code Ann. § 21-1-503(c)(1); a claim of violation of the Arkansas Whistle Blower Act (WBA), Ark. Code Ann. § 21-1-601, *et seq.*, a claim of violation of, the Public Employee's Political Freedom Act (PEPFA), Ark. Code Ann. § 21-1-503, a claim of violation of the First Amendment of the U.S. Constitution, a claim of violation of Plaintiff's right to Academic Freedom, a claim of violation of Article 2 Section 6 of the Arkansas Constitution; and a claim for tortious interference with contract..

### Parties, Jurisdiction, and Venue

2. Plaintiff Robert Steinbuch is a resident of the State of Arkansas, a 2015 Fulbright Scholar in Teaching, and a tenured Professor of Law. He brings this action in his capacity as a person entitled to request and receive certain public records under the AFOIA, Ark. Code Ann. § 25-19-101, *et seq.*, and as a public employee who is protected against adverse action under the WBA.

3. Plaintiff is a recognized expert on the AFOIA and the current co-author of the forthcoming 6th edition of the treatise on the AFOIA.

4. Defendants University of Arkansas, aka University of Arkansas—Little Rock, and the Trustees of the University (collectively UA/UALR) constitute a "department, agency, or institution of the" State of Arkansas that "is wholly or partially supported by public funds," making UALR subject to the AFOIA's requirements of providing access to certain public records upon request.

5. Defendant UA/UALR is also a "public employer" within the meaning of the WBA, and is prohibited from "tak[ing] an adverse action against a public employee because the employee participates or gives information in…a court proceeding."

6. Defendant Michael Schwartz is the Dean of the UALR William H. Bowen School of Law (Bowen), and he is sued in his official and personal capacity, as he has administrative control over certain records that form the basis of this lawsuit, making him a "custodian" of those records within the meaning of Ark. Code Ann. § 25-19-103(1)(A), and he has acted with malice.

7. Defendant Theresa Beiner is the Associate Dean of Academic Affairs of Bowen, and she is sued in her official and personal capacity, as she engaged in adverse actions against Plaintiff in retaliation for his filing the original Complaint in this matter and has acted with malice.

8.  At the relevant time, Defendant Zulma Toro was the Provost and Executive Vice Chancellor of the University of Arkansas—Little Rock, and she is sued only in her official capacity.

9.  Defendant JoAnn Maxey is employed in the office of General Counsel for Defendant UA/UALR, and she is sued in her official capacity, as she has facilitated and furthered efforts of other defendants, jointly and individually, to retaliate against Plaintiff for his filing of the original Complaint in this matter.

10. Jurisdiction and venue are proper in this Court as to the AFOIA claim, as UA/UALR is "a department, agency, or institution of the" State of Arkansas. *See* Ark. Code Ann. § 25-19-107(a) (mandating that all suits against an institution of the state are to be brought in Pulaski County, Arkansas).

11. Jurisdiction and venue are proper in this Court as to the WBA claim, as the claim is brought within 180 days of the adverse action and UALR is "an agency, department, or institution of state government." *See* Ark. Code Ann. §§ 21-1-604(a) through -604(b).

12. Jurisdiction and venue are proper in this Court as to all other claims pursuant to this Court's general jurisdiction and the location of the parties.

### Relevant Legal & Statutory Framework

13. For nearly fifty years, it has been a well-settled truth that he AFOIA was "passed wholly in the public interest and is to be interpreted liberally." *Laman v. McCord*, 245 Ark. 401, 405, 432 S.W.2d 753, 755 (1968).

14. That liberal interpretation means that, "whenever the legislature fails to specify that any records in the public domain are to be excluded from inspection…then privacy

must yield to openness and secrecy to the public's right to know the status of its own affairs." *Ragland v. Yeargan*, 288 Ark. 81, 85, 702 S.W.2d 23, 25 (1986).

15. Furthermore, even the express AFOIA exemptions found in Ark. Code Ann. § 25-19-105 are to be narrowly construed. *See Hengel v. City of Pine Bluff*, 307 Ark. 457, 821 S.W.2d 761 (1991); *see also Young v. Rice*, 308 Ark. 593, 826 S.W.2d 252 (1992) (holding that AFOIA exemptions are to be narrowly construed "in a manner that favors disclosure").

16. Because there is a presumption in favor of disclosure, an entity or custodian claiming an exemption under the AFOIA must carry the burden of establishing that the exemption applies and justifying the nondisclosure of information. *See, e.g., Orsini v. State*, 340 Ark. 665, 13 S.W.3d 167 (2000).

17. In the context of education-related records, the AFOIA shields from disclosure records that are "education records as defined in the Family Education Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g, unless their disclosure is consistent with the provisions of that act." Ark. Code Ann. § 25-19-105(b)(2).

18. In construing and defining the scope of the FERPA exemption, the leading treatise on the AFOIA states:

> FERPA is limited to records that expressly or effectively identify students personally. Applying [FERPA] in this manner, the Wisconsin Supreme Court held that a state university must comply with a researcher's FOI request for student applications revealing such information as past grade point averages, class rankings, admission test scores, race, gender, and socio-economic background, but with any personally identifying information redacted. Because this information would not "make a student's identity easily traceable," the court said, its disclosure would not violate FERPA. This approach is consistent with the Arkansas FOIA's requirement that records containing both exempt and non-exempt information be disclosed with the [former] deleted.

J. Watkins & R. Peltz, The Arkansas Freedom of Information Act (m & m Press, 5th ed. 2009), at 120 (Watkins, at __) (citing *Osborn v. Board of Regents*, 647 N.W.2d 158 (Wis. 2002)) (Plaintiff is the co-author on the next edition of this acclaimed treatise).

19. Under FERPA, as is relevant to the AFOIA, the two broadest sub-categories of the term "personally identifiable information" are: (1) Other information that, alone or in combination, is linked or linkable to a *specific* student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with *reasonable certainty*; or (2) Information requested by a person who the educational agency reasonably believes knows the identity of the student to whom the record relates. *See* Ark. Op. Att'y Gen. No. 2012-083 (citing 34 C.F.R. § 99.3).

20. Moreover, "[t]he FOIA relates to FERPA is such a way that, if the release of an education record is consistent with FERPA, e.g., through redaction, then the FOIA— more specifically, A.C.A. § 25-19-105(b)(2)—does not shield the record from disclosure." Ark. Op. Att'y Gen. 2013-027.

21. Similarly, as the Attorney General explained in the context of FERPA and the AFOIA, "a requester's identity—and, *a fortiori*, his or her unique expertise or knowledge—is generally irrelevant to assessing the custodian's disclosure obligations." *Id.*

22. In 2015, the Arkansas legislature amended the Public Employee's Political Freedom Act of 1999 to make retaliation against a public employee who exercised his rights under the AFOIA. Ark. Code Ann. § 21-1-503.

23. Ark. Code Ann. § 21-1-503(c)(1) makes it unlawful "for any public employer to discipline, to threaten to discipline, to reprimand either orally or in writing, to place any notation in a public employee's personnel file disciplining or reprimanding the public employee, or to otherwise discriminate against a public employee because the public employee exercised the right to communicate with an elected public official or exercised a right or privilege under the" AFOIA.

24. The Arkansas Whistle-Blower Act, codified at Ark. Code Ann. §§ 21-1-601 through -610, was enacted in 1999 to protect public employees from discharge or retaliation by public employers in certain circumstances. *See* 1999 Ark. Acts 1523.

25. A whistle-blower who is retaliated against by a public employer may seek *actual damages* and injunctive relief under the WBA. *See Crawford County v. Jones*, 365 Ark. 585, 595, 232 S.W.3d 433, 441 (2006).

26. One of the "protected activities" under the WBA is where a public employee "participates or gives information in [a] court proceeding." Ark. Code Ann. § 21-1-603(c).

27. University of Arkansas Board Policy 335.1, Section IV-A, expressly provides: "Obeying the law, both in letter and in spirit, is the foundation on which the University's ethical standards are built."

### Relevant Facts

### Prior FOIA Requests

28. Plaintiff is considered a leading expert on the AFOIA and routinely opines in local, state, and national press on matters concerning the AFOIA. For example, Plaintiff opined on the University of Arkansas's then refusal to release certain documents

concerning the Advancement division at Fayetteville; the University later released those documents.

29. The events regarding the Advancement division lack of openness and compliance with AFOIA requests resulted in the University adopting new procedures regarding the AFOIA, as reflected in Board Policy 270.1, dated January 24, 2014.

30. In 2012, Plaintiff submitted an AFOIA request to UA/UALR for an existing Excel document that contained the LSAT scores, undergraduate GPA, law-school GPA, race, gender, and age data for all students who, over a seven-year period, graduated from Bowen and took the bar exam.

31. Initially, Plaintiff's 2012 request was denied by the University in part; however, upon request from a state legislator, the Arkansas Attorney General issued opinion number 2012-083, in which it was opined that all of the information sought by Plaintiff was subject to release once the records were "de-identified" within the meaning of FERPA, i.e., redacted.

32. Subsequently, Plaintiff obtained the requested information from UA/UALR from then Bowen Interim Dean Paula Casey, which included first-time bar-passage status, race/ethnicity, LSAT score, undergraduate GPA, law-school GPA, and gender for the Bowen graduates.

33. Plaintiff was unable, however, to receive the records in their original electronic form, as the University had destroyed those prior to the issuance of Arkansas Attorney General opinion but after Plaintiff had made his AFOIA request.

34. Plaintiff was also able to obtain this information in response to a similar request in November 2013 from Defendant Schwartz. *See* Exhibit A to Third Amended and Second Supplemental Complaint (the "Previous Complaint").

35. Defendants now contend in pleadings and court that, while the production in 2012—which included first-time bar-passage status, race/ethnicity, LSAT score, undergraduate GPA, law-school GPA, and gender for Bowen graduates—remains proper and legal, that the Defendants in fact *violated* state and federal law in producing the records in 2013.

36. Specifically, On January 25, 2016, University Counsel stated to this Court that the 2013 release of data was "inadvertent."

37. That claim is contrary to an email exchange between Plaintiff and Assistant Dean Eric Malmberg.

38. On November 11, 2013, Plaintiff wrote to Mr. Malmberg:

Erik,

THX. Could you please give me the code for the columns, e.g., what is "6156, LGPA, XGPA..."
Also, do you have the race information for this data? Those da[ta] are typically included in such material. I got it previously. So, if you have that, I would please like to receive the chart with that included.

THX again rob

39. On Nov 18, 2013, Assistant Dean Malmberg responded (emphasis added):

Rob,
....
The ethnicity codes consists of the following:
B= Black
W=White
H= Hispanic
I=American Indian
O= Asian or Pacific Islander

X=Unknown

I am attaching an updated version of the data file **that Dean Schwartz has approved for release to interested faculty that includes the ethnicity column** you requested.

Erik

### Plaintiff's Current AFOIA Requests

40. On October 12, 2015, consistent with earlier requests for similar records, Plaintiff requested identity-redacted public records from Bowen which contained student data that had been used to create a presentation that was prepared for the September 2015 Bowen Faculty Meeting, as well as any spreadsheets Bowen had developed using that same data.

41. Plaintiff's October 12 request for records was sent to Mr. Erik Malmberg and Ms. Judy Williams, with the latter being copied on the request "because [she] had previously indicated that [Plaintiff] should do so when requesting public records." Plaintiff's request continued, "Of course, I only want identity-redacted records consistent with the FOIA. *See* AG Opinion 2012-083."

42. Despite Plaintiff's clear language indicating that his request was made pursuant to the AFOIA, as well as his reference to an Attorney General Opinion that dealt specifically with AFOIA requests, on October 13, Defendant Schwartz responded to the October 12 request with confusion, writing:

> I cannot tell if you are making an FOI request or not, and Judy Williams is also uncertain.  Because of the time deadlines that attach to FOI requests, we want to be sure.

43. Defendant Schwartz knew or should have known that Plaintiff was making an FOI request, as did Judy Williams.

44. Plaintiff responded on October 13, confirming the obvious fact that the records were being requested under the AFOIA.

45. On October 15, Ms. Williams emailed Plaintiff with records purporting to be in fulfillment of his October 12 request. *See* Exhibit B to the Previous Complaint.

46. Exhibit B contains highly redacted records for 1546 students who graduated over the *ten-year period* between 2005 and 2015. The race, LSAT score, undergraduate GPA of the graduates were all completely redacted.

47. The document also does not reflect bar-passage status, but it is unclear whether that was redacted or never present. If bar-passage status is not on this document, it must be compiled elsewhere, but not produced, as the school's earlier presentation, which this spreadsheet was used to create, specifically concerned bar passage.

48. Plaintiff responded to Ms. Williams's October 15 email to note some problems with the records as produced.

49. Specifically, Plaintiff wrote to Ms. Williams:

> I see that "Ethnicity," "LSAT," and "LGPA" are redacted from the spreadsheet. I'm not sure whether this was an oversight. I am aware that the University had once taken the position that this was exempt information, but that position was rejected by the Attorney General in AG Opinion 2012-083. And the University had understood this when it thereafter, on repeated occasions, provided me with that information. Accordingly, please provide me with the spreadsheet including "Ethnicity," "LSAT," and "LGPA."
>
> Finally, it appears that the document is an image of an Excel spreadsheet. I request the document in the electronic format in which it seemingly exists (or to which it can readily be converted), *i.e.*, Excel.

50. The "Ethnicity" column of the requested record breaks students into the following groups: Black, White, Hispanic, American Indian, Asian or Pacific Islander, and Unknown.

51. Bowen routinely collects and analyzes ethnicity data of applicants, admittees, students, graduates, and Bar-exam candidates.

52. The LSAT column contains students' LSAT scores, which is an integer between 120 and 180 and which, in the case of Bowen, generally ranges between about 144 and 168 according to previously obtained records.

53. The LGPA is a student's undergraduate GPA, which is presented on a four-point scale, carried out to two decimal places, and, vis-à-vis Bowen, generally falls between 2.00 and 4.00.

54. The LSAT scores across ethnicities at Bowen differ significantly.

55. For example, while LSAT scores for white students at Bowen are distributed relatively equally across all four quartiles, over 60% of the African American Bowen students are situated in the bottom quartile of LSAT scores at Bowen.

56. On October 19, Defendant Schwartz responded to Plaintiff's October 15 email, writing (emphases added):

> Because you served on the law school's admissions committee throughout the time period when all of the students in this spreadsheet applied to the law school, **it is reasonable to assume your knowledge of the applicants, particularly applicants whose credentials are distinctive in terms of being higher or lower relative to their peers**. Likewise, it is likely there are combinations of undergraduate GPA and LSAT score that would be memorably distinctive. Those issues would be exacerbated by ethnicity data, particularly because the law school admits so few students of color. **It is therefore reasonably likely that, if we were to provide the redacted information, you would be able to infer identity and therefore the data is data that could reasonably be expected to lead to personally identifiable information.** For similar reasons, as a professor at a small law school like Bowen that has only a very small number of students of color, the ethnicity data needed to be redacted in any event because providing even the ethnicity data alone would reasonably be expected to lead to personally identifiable information.

57. Plaintiff, however, did not serve on the law school's admissions committee throughout the time period when all of the students in this spreadsheet applied to the law school.

58. Defendant Schwartz would have to be ignorant of both when Plaintiff began employment at UALR and when he was, years later, appointed to the admissions committee for Schwartz's statement to be true.

59. Plaintiff did not serve on the admissions committee during the whole period that the spreadsheet data covers, yet Defendants redacted information from all 10 years of data.

60. Plaintiff was not employed by UALR when some of the graduates reflected in the spreadsheet were admitted to the law school, yet Defendants redacted information from all 10 years of data.

61. Plaintiff was not employed by UALR when some of the graduates reflected in the spreadsheet graduated from the law school, yet Defendants redacted information from all 10 years of data.

62. During the years that Plaintiff did serve on the admissions committee at the UALR Bowen School of Law, he only saw a percentage of the applicants, because the general admissions committee members, oddly enough, see only some applicants, yet Defendants redacted information from all graduates.

63. The admissions committee at UALR Bowen School of Law as a whole does not make the final decision to admit students. The admissions committee can cause some applicants to be rejected (*i.e.*, only those that it actually reviews), but the decision to

admit is made by a *non-faculty* administrator, who considers, *inter alia*, the ethnicity of applicants in making admissions decisions.

64. Even though Plaintiff only saw a portion of graduates reflected in produced document, Defendants redacted information from all graduates.

65. Defendant Schwartz contended that is reasonable to assume Plaintiff's knowledge of applicants whose credentials are distinctive in terms of being higher or lower relative to their peers would cause their identity to be disclosed, yet he redacted information from all graduates.

66. Defendant Schwartz contended that it is likely there are combinations of undergraduate GPA and LSAT score that would be memorably distinctive that would cause these graduates' identity to be disclosed, yet he redacted information from all graduates.

67. Defendant Schwartz contended that because of the number of students of color at Bowen, "the ethnicity data needed to be redacted in any event because providing even the ethnicity data alone would reasonably be expected to lead to personally identifiable information."

68. Thus, Schwartz contends that it can never release ethnicity data. As such, in addition to the 2013 release of data by the school that Defendants now assert violated both state and federal law, the 2012 release of data by then Interim Dean Paula Casey would, by extension, also have to have been a violation of both state and federal law.

69. Even if Defendants' incorrect claims regarding the number of students of color at Bowen had merit, those claims could not apply to whites, as that group is so large that

defendants could not reasonably assert that any individual's identity could be reasonably discovered. Yet, defendants redacted the information regarding whites.

70. Even if Defendants' incorrect claims regarding the number of students of color at Bowen had merit, those claims could not apply to African Americans, as that group is so large that defendants could not reasonably assert that any individual's identity could be reasonably discovered. Yet, defendants redacted the information regarding African Americans.

71. Plaintiff responded to Defendant Schwartz's email, explaining that Schwartz's reasoning was flawed, citing Ark. Op. Att'y Gen. No. 2012-083 and the Wisconsin Supreme Court case cited therein, referencing Professor Watkins' and Peltz's treatise on the AFOIA, and refuting Schwartz's assertions generally.

72. Rather than taking this opportunity to correct his obvious error, Defendant Schwartz persisted in his position, writing in response to Plaintiff's October 19 email, "[w]ith regard to the other issues raised in your email, we stand by our previous response, but are continuing to evaluate your request and reserve the right to supplement our response."

73. Moreover, Defendants Schwartz's assertion regarding "ethnicity data alone" is specious at best, as Defendants have expressly conceded that data from groups three or more persons do not implicate identity of the group members, and they have made this concession as recently as November 17, 2015, when Defendant Schwartz sent a survey to faculty and wrote:

> I want to encourage you to complete the survey. Working with the survey data will be an important educational experience for Dr. Nolan's students. As employees of UALR, supporting another department's educational efforts strikes me as part of good citizenry. In addition, I think we will get useful information

about our organizational culture. Finally, Dr. Nolan has graciously agreed to help us in constructing our graduate survey as part of our nascent outcomes assessment efforts, and the results of those outcomes efforts will help us evaluate the success of our curriculum and make any necessary changes to maximize student learning.

74. The University-sponsored (and, therefore, publicly funded) survey stated, in pertinent

part:

**Risks and benefits:** There is no risk to you by participating in this study. Your participation will be anonymous and voluntary. You may choose to skip any question that makes you feel uncomfortable or are not able to respond to. We are sensitive to the fact that the cross-tabulation of multiple background characteristics (e.g., gender, years experience, ethnicity, etc.) could result in a threat to your anonymity. Therefore, we will not report any findings from cross-tabulated cells with three or fewer individuals.

75. All or virtually of the minority cohorts in the data requested by Plaintiff have above

three individuals per year.

76. Moreover, there are approximately 100 whites in each class, yet defendants failed to

produce the relevant data for whites associated with ethnicity.

77. Defendants cannot dispute that even using their own "logic" they have no basis to

withhold the ethnicity-linked data for whites.

78. Thus, by Defendants' own admission, the data sets that Plaintiff requested do not

implicate revealing identity of members.

79. Plaintiff responded to Defendant Schwartz's October 19 email, explaining that Schwartz's reasoning regarding AFOIA and FERPA was contrary to the law, citing Ark. Op. Att'y Gen. No. 2012-083 and the Wisconsin Supreme Court case cited therein, referencing Professor Watkins's treatise on the AFOIA, and refuting Schwartz's assertions generally.

80. Rather than taking this opportunity to correct his obvious error, Defendant Schwartz persisted in his flawed position, writing in response to Plaintiff's October 19 email,

"With regard to the other issues raised in your email, we stand by our previous
response, but are continuing to evaluate your request and reserve the right to
supplement our response."

81. Plaintiff alerted the Defendants to keep the documents requested under the AFOIA
intact, pursuant to a "litigation hold," so as to avoid the destruction issue that
transpired regarding Plaintiff's 2012 request.

82. On December 15, Defendant Schwartz sent emails to various alumni, students,
faculty, staff, and others stating:

I have been contacted by students and alumni asking questions about the
performance of Bowen students in law school and on the bar exam. On the three
most recent administrations of the Arkansas bar exam, the first-time bar pass rate
for white students is 75%, and the first-time bar pass rate for minority students is
higher, 80%. Bowen's overall first-time bar pass rate has not changed, while most
other law schools throughout the country have seen a marked decline. As for the
students currently attending Bowen, in the past two years, the academic attrition
rate is minimal for all students, less than 3%, with only a marginal difference
between white and minority student attrition. These good results are directly
attributable to the law school's cutting-edge academic support and bar pass
programs.

83. Schwartz made these assertions to mislead readers as to the scope of and problems
with Bowen's race-differing admissions standards.

84. Regarding the penultimate paragraph, while the overall first-time bar pass rate for
minority students was 80%, the first-time bar pass rate for some minority cohorts
were much lower. Schwartz intentionally attempted to conceal this fact to mislead
the public.

85. Since Defendant Schwartz provided one aggregate group for minorities in his email,
but separated out only whites as an individual ethnicity, on December 15, Plaintiff
requested pursuant the AFOIA, any records showing for the three most recent

administrations of the Arkansas bar exam the separate bar passage rates for any

ethnicity.

86. On December 16, Defendant Schwartz wrote:

There is not a particular report or record that provides the information you have requested. ACA section 25-19-105(d)(2)(C) provides that the University is not required to compile or create records in response to a request. Further, any record that would reflect whether a student has self-identified as White, African American, Asian American, Native American, Hispanic, Multiracial, or Undeclared is exempt as such a record would contain personally identifiable student information, which is protected under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. section 1232g and 34 CFR section 99, and ACA section 25-19-105(b)(A).

87. Defendant Schwartz thus made two incredible claims: 1. that no such records exist,

and 2. that he can never produce records showing ethnicity of any kind.

88. So, on December 16, Plaintiff requested pursuant to the AFOIA all documents used to

compile the results provided in the December 15th email from Dean Michael Hunter

Schwartz.

89. On December 17, 2015, Defendant Schwartz wrote:

In response to your request yesterday . . . please see the attached documents. The

documents have been redacted of all FERPA protected information, which could

reasonably lead to the personal identification of individual students. *See* Exhibits C

and D to the Previous Complaint.

90. Schwartz redacted ethnicity-specific data, again.

91. The documents provided (Exhibits C and D to the Previous Complaint) belie

Defendant Schwartz's one-day-prior claim that there was no report or record that

provides the information Plaintiff requested regarding ethnicities. Indeed, Exhibit C

contains the "80% minority" figure that Defendant Schwartz explicitly referenced in

his December 15th mass email, but the document provided to Plaintiff has that very aggregate minority status redacted. Indeed, Exhibit C has all aggregate ethnicity data redacted, notwithstanding Defendant Schwartz's reference to such data in his public email.

92. Thus, Defendant Schwartz apparently believes that he may make public disclosures of public data but then refuse to turn over the same data pursuant to an AFOIA request.

93. As noted above, Defendant Schwartz's second claim in his FOIA response was that he can never provide ethnicity data. This is contrary to the Attorney General's opinion discussed above and the school's prior disclosure of ethnicity data for, at least, the seven-year period that the Defendants, so far, have not alleged is another example of their violation of state and federal law. Thus, the law school's prior production of race data belies Defendant Schwartz's current claim that the school is prohibited from producing any ethnicity data.

94. Exhibit D contains the unredacted names, home addresses, personal phone numbers, and email addresses of some graduates. It has only the unredacted names of others, and grades in classes disassociated with any identifier whatsoever. It otherwise redacts, *inter alia*, bar performance, race, undergraduate GPA, gender, and LSAT.

95. The redaction in Exhibit D is for all graduates, regardless of race and LSAT scores.

96. Even if Defendants' incorrect claims regarding the size of certain minority cohorts had merit, those claims could not apply to whites, as that group is so large that defendants could not reasonably assert that any individual's identity could be reasonably discovered. Yet, defendants redacted the information regarding whites.

97. Even if defendants' incorrect claims regarding the size of certain minority cohorts had merit, those claims could not apply to African Americans, as that group is so large that defendants could not reasonably assert that any individual's identity could be reasonably discovered. Yet, defendants redacted the information regarding African Americans.

### Retaliaton

98. Plaintiff filed his original Complaint in this matter on November 17, 2015.

99. On or about November 19, 2015, Plaintiff learned that Defendant Beiner had contacted a minority student from one the courses that Plaintiff teaches, asking the student whether Plaintiff had discussed his race-related admission and Bar research with his class.

100.    Beiner specifically sought out a minority student to sow racial discord.

101.    Plaintiff is entitled to discuss his race-related admission and Bar research with his class whether the administration likes it or not.

102.    The student responded in the affirmative to Beiner's inquiry.

103.    Defendant Beiner's contact with the student was designed to retaliate against Plaintiff for filing his original Complaint.

104.    Defendant Beiner had not previously contacted students from Plaintiff's classes regarding Plaintiff's research, despite Beiner and Defendant UA/UALR's being aware of Plaintiff's research for years.

105.    Defendant Beiner had not previously contacted students from Plaintiff's classes regarding Plaintiff's statements, despite Beiner and Defendant UA/UALR's being aware of Plaintiff's research for years.

106.   Beiner never informed Plaintiff of her surreptitious actions because she acted out of malice.

107.   Based on Defendant Beiner's actions, Plaintiff amended his complaint to add claims of retaliation in violation of the WBA and the AFOIA anti-retaliation statute, Ark. Code Ann. § 21-1-503(c)(1).

108.   Notwithstanding that the student responded in the *affirmative* to Beiner's inquiry, Beiner dropped the matter immediately after Plaintiff's First Amended Complaint was filed.

109.   Beiner's actions were retaliatory and served no legitimate purpose.

110.   Beiner has no legitimate explanation for why she contacted this student at this time and what she was investigating.

111.   The fact that the matter was dropped even though the student responded in the affirmative indicates that there was no substance to the investigation, as a response in the negative would have produced the same result. Thus, the result of the so-called investigation was a foregone conclusion even before it began.

112.   On Novermber 27, 2015, Professors Adjoa Aiyetoro and Sarah Jenkins emailed Beiner, complaining about the potential impact of Plaintiff's AFOIA lawsuit.

113.   Specifically, as is important herein, Aiyetoro's email began, "I spoke with Sarah [Jenkins] on Wednesday *about the lawsuit* and the effect *it* is having" (emphases added). Jenkins' email began, "Students of color *have read the complaint* and are very distressed" (emphasis added).

114.   Aiyetoro's and Jenkins' complaints were based on Plaintiff's AFOIA lawsuit.

115.   Prof. Aiyetoro's email referenced this "lawsuit" no fewer than three times and made multiple false allegations about Plaintiff's grading policies and perspective.

116.   Jenkins' email referenced "the complaint," concluded with a reference to Plaintiff and "his lawsuit," and made multiple false allegations about Plaintiff's grading policies and "perceived or alleged bias."

117.   Neither email referred to the media or Plaintiff's statements to any media outlet whatsoever.

118.   However, Beiner and Schwartz now claim that they pursued Jenkins' and Aiyetoro's complaint because of concerns about Plaintiff's statements to the press.

119.   Even had Plaintiff made the statements to the press that Beiner and Schwartz believed Plaintiff made, Beiner and Schwartz would not be entitled to investigate those statements.

120.   Plaintiff is free to make statements to the press even if beiner and Schwartz disagree with those statements.

121.   Had Aiyetoro's and Jenkins' complaints been based on Plaintiff's statements to the media, Schwartz'z and Beiner's (both deans) actions against Plaintiff would be a transparent violation of the First Amendment and Academic Freedom.

122.   Beiner teaches Constitutional Law.

123.   Deans of any law school could never reasonably believe that investigating a Professor for statements to the press, the archetype of the First Amendment's protection of Free Speech and Freedom of the Press, could be proper. Beiner's and Schwartz's actions were, therefore, intentional and malicious.

124.   In response to the email from Prof. Aiyetoro, Defendant Beiner wrote,

Thank you for your e-mail about some of the concerns raised by this. I've been in touch with [Defendant Schwartz], and he and I are discussing how best to proceed. One or both of us will be in touch soon. In the meantime if you, Sarah, or Ranko have any further thoughts on this, I welcome hearing from you.

125.    Defendant Schwartz then contacted Plaintiff via email, writing (emphasis added):

Normally, if I were to receive a message like the message below, either Terri or I would forward the message to the faculty member in question (in this case you, Rob), and we would work through the issues with all involved. However, *because I am a named defendant in the referenced lawsuit*, by copy of this message to Dr. Toro, I am asking Dr. Toro to investigate and resolve the issues.

126.    On December 1, 2015, Plaintiff responded to Defendant Schwartz, agreeing with Schwartz's decision to recuse, given the pending lawsuit, and affirmatively stating that Profs. Aiyetoro and Jenkins's claims were baseless, demonstrated their lack of understanding of even which classes Plaintiff teaches and his grading policies therein, and were nothing more than slanderous and race-baiting efforts to impugn Plaintiff's character.

127.    Profs. Aiyetoro and Jenkins's claims were baseless, demonstrated their lack of understanding of even which classes Plaintiff teaches and his grading policies therein, and were nothing more than slanderous and race-baiting efforts to impugn Plaintiff's character.

128.    Back in May 2014, however, knowing the oft-times dysfunctional nature of the administration at Bowen, Plaintiff had already submitted his grading policies to Schwartz for approval, writing, in pertinent part:

I'm preparing for both my summer class and grading this completed Spring. In this regard, I wanted to check with you whether my approach to class participation is satisfactory under your criteria. What I've done throughout my teaching is give check marks (a point) for class participation each time students participate. These assessments are made during class, and I decide on the spot whether any given participation gets credit. If so, the student gets a check mark. A student doesn't get a check just for speaking. The participation must be

*Steinbuch – Fourth Amended Complaint*
*Page 22 of 48*

meaningful—a correct answer to a question, an insightful comment, or an insightful question. Then at the end of the semester, the points are totaled. Then I look for natural breaks, evaluate overall how the class performed, and assign how much students' grades are to be adjusted to reflect meaningful, active participation. Participation scoring provides an additional assessment in the class to capture student comprehension and engagement.

If you approve, I will use this approach in my current grading and for the summer (and in the future). If not, I won't.

129.    After some back and forth, Defendant Schwartz eventually approved of Plaintiff's

grading policies, writing:

I spoke to Dean Epps; Bowen has never required that faculty members weigh class participation in their grading so, of course, you are free to include or exclude class participation in your grade calculations.

I do not see any inherent problems in the methodology you have used for class participation. I do have a response to your expressed concern that, "if I say 30 checks provides for the maximum bump, and everyone gets over 30 checks, then participation will literally have no effect on the grades." That possibility would not be a concern to me for four reasons: (1) if the methodology encouraged all your students to engage in class discussions at the level your best class participators have participated in the past, your class discussion would be outstanding and produce better learning for all; (2) I believe that students resound positively to the very few opportunities law professors give them to have a modicum of control over their grades; (3) in 22 years of law teaching, I have never observed that all or even nearly all students take advantage of such opportunities (instead, even class participation has a natural spread); and (4) I do not use class participation to achieve grade spreading; for me, it has always just been a reward for students who go over and above in making class contributions.

130.    Given that Plaintiff's grading policies had been explicitly approved in writing by

Defendant Schwartz and, therefore, Defendant UA/UALR generally, Plaintiff's

response—and Profs. Aiyetoro and Jenkins's utter lack of any evidence of bias by

Plaintiff—Plaintiff's December 1 response his should have ended the matter.

131.    However, Defendant Schwartz intentionally and maliciously withheld the fact of his prior approval of Plaintiff's grading from the Provost.[1]

132.    Plaintiff filed for a TRO/injunction.

133.    Following Plaintiff's filing, Defendant Maxey, in her official capacity as counsel for UA/UALR, contacted Plaintiff's attorney, asking if the hearing could be rescheduled, as Defendant Toro was going to be out of state until after the first of the year. Plaintiff's counsel agreed on the condition that the interview with Defendant Toro would not take place prior to the hearing on Plaintiff's TRO/injunction. Defendant Maxey agreed to this condition, and the hearing date was rescheduled.

134.    Notwithstanding her earlier agreement, Defendant Maxey emailed Plaintiff's attorney on December 22, asserting that the interview should proceed *prior* to the January 25 hearing, because, "the emails from Professors Aiyetoro and Jenkins raised two issues that require the University to conduct an investigation [...] whether [Plaintiff's] grading policy violates the law school's grading policy and whether there are any legitimate race bias concerns with [Plaintiff's] grading practice." *See* Letter from JoAnn C. Maxey, dated December 22, 2015 (attached as Exhibit B to the Previous Complaint).

---

[1]  Notably, Professor Aiyetoro, in her complaining email, conceded that she too grades participation. Given her history of writing articles such as "Why Reparations to African Descendants in the United States Are Essential to Democracy," "Truth Matters: A Call for the American Bar Association to Acknowledge Its Past and Make Reparations to African Descendants," "Formulating Reparations Litigation Through the Eyes of the Movement," and similar articles regarding black-white race relations, it is unfathomable to think that Plaintiff's grading policy might be "biased" based on his statements to the press, but Prof. Aiyetoro's grading policy is above reproach.

135.    Defendant Schwartz stated in court, however, that he felt free, indeed compelled, to investigate statements plaintiff made to the press about admissions at Bowen.

136.    Schwartz believes that he can control Plaintiff's statements to the press.

137.    Schwartz believes that statements made to the press could legitimately be the basis for adverse employment actions by him.

138.    Schwartz believes that the First Amendment and Academic Freedom do not protect Plaintiff if Schwartz believes that Plaintiff's statements to the press are objectionable.

139.    Schwartz believes that he can make adverse employment decisions regarding Plaintiff based on Plaintiff's statements to the press.

140.    Schwartz believes that he can make adverse employment decisions regarding Plaintiff based on Plaintiff's political or philosophical beliefs.

141.    Defendant Maxey's job responsibilities as an employee of the Office of General Counsel of the University of Arkansas system do not extend to the investigation of internal complaints regarding grading policy at the law school; indeed, the *only* way Defendant Maxey could have any role in this matter is if the interview were somehow related to the underlying litigation.

142.    Defendant Maxey's letter explicitly threatened Plaintiff's employment if he refused to "participate" prior to this Court's scheduled hearing.

143.    Notably and predictably, Plaintiff's previously approved participation-grading method produced tiny differentials differences between the best and worst scores on participation, and in which no evidence of racial bias could be inferred by anyone

with even a basic understanding of statistics—a fact lost on those rogue professors who clearly made baseless accusations without ever seeking the relevant information.

144.    The bald-faced, baseless allegations made by Aiyetoro and Jenkins rest solely and repeatedly on the lawsuit.

145.    Since the initiation of this suit, Defendants have intermittently asserted that, notwithstanding that none of the documentation from Aiyetoro and Jenkins reference the media, Plaintiff's statements to the media regarding his AFOIA suit and his research are not entitled to First Amendment and academic-freedom protections and should, instead, be subject to a McCarthy-like inquisition. *See Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274 (1977).

146.    Tellingly, Defendants did *not* raise the "statements to the media" basis for the investigation in their letter to counsel for Plaintiff.

147.    Another Bowen faculty member, Professor Joshua Silverstein, explained to his colleagues in an email the absurdity, and violation of academic-freedom, inherent in having to respond to baseless claims of bias, writing, in pertinent part:

> I want to confine my detailed comments to...the question of whether Rob's lawsuit and his public comments relating to the suit justify a change in the grading practices in his class. I think the answer to that question is no. In fact, I think any move to limit how Rob grades because of his lawsuit and his related scholarly research and service work would be a violation of academic freedom.

> To elaborate, most college and graduate school grading is not anonymous. Law schools are relatively unique in applying such a high degree of anonymous grading. Furthermore, much law school grading is not anonymous. In many classes, such as seminars and certain "skills" courses, anonymous grading is impossible or impractical. And in analytical skills courses (what are typically and confusingly called "doctrinal" classes), many professors at this institution and throughout legal education use non-anonymous components, including class participation, oral presentations, and oral exams. Thus, there is no inherent problem with any non-anonymous elements of Rob's grading. More generally, I have discussed Rob's grading practices with him at length on countless

occasions. And I can safely state that Rob's grading protocols fall well within established practices throughout higher education. So, the first conclusion I offer here is that there is nothing, in general, problematic with how Rob grades and his actions are wholly consistent with our academic rules and the practices at this institution.

The question, then, is whether Rob's lawsuit and his public comments relating to the suit justify limiting Rob's usage of well-established, permissible grading protocols. As I said, the answer is no, and any such limits would be a violation of academic freedom. To see this, consider the following examples:

[...]

Example 3: Should a professor who belongs to a racial minority and is teaching a critical race theory course be forbidden from or limited in grading white students because the professor believes and has publicly stated, based on scores of social science books and articles, that whites have a more a difficult time seeing and understanding the subject of the course (racial discrimination) without any actual evidence of grading bias?

Example 4: Should a Palestinian or Jewish professor teaching a course on the Middle East be restricted from grading Jewish or Palestinian students based on the public statements of the professor about the Middle East without any actual evidence of grading bias?

[...]

The answer to the questions asked in all of these examples is no. And each of these examples raises at least as much of a specter of bias as Rob's situation. Indeed, several of them raise a much greater possibility of bias. Yet any restrictions placed on the professors in my five examples without actual evidence of bias would be a violation of academic freedom. As a result, the same is true with respect to Rob and his classes.

My five examples and Rob's case all reflect a broader principle. The teaching, scholarship, and service of university professors are protected by principles of academic freedom absent genuine evidence of wrongdoing. Speculation based on theories, however well-informed such speculation might be, is simply not a legitimate ground to compel professors to deviate from standard, permissible practices. There are an infinite number of potential biases. And there are hundreds or thousands of types of bias established in the social science literature. If (1) mere speculation based on theories about whether a professor is biased, or (2) the mere appearance of a possibility of bias, justified changes to a professor's standard, permissible practices, academic freedom would be a dead letter.

As for the concerns of students that they will be treated unfairly, I offer the following. First, those students are every bit as justified in being concerned as those in the five examples I offered above. Second, the students are entitled to raise those concerns with Rob, other professors, and administrators at this institution. And if, after those discussion, they feel their concerns are not addressed to their satisfaction, then the answer is that they must live with it, just like the students in my five examples above. If we are committed to academic freedom, then we do not restrict the legitimate and permissible practices of university professors because these professors hold views that students might find upsetting—even deeply upsetting—without genuine evidence the views are leading the professor to act in improper ways.

[...]

If students, alums, and professors have general concerns about bias in grading, they are free to propose rule changes that apply to all faculty. But it violates academic freedom to single out individual professors who use legitimate and permissible grading practices because those professors hold controversial views that upset some people. [...] Absent genuine evidence of grading bias on Rob's part, there is no justification for any action that compels or seeks to compel Rob to change how he grades.

148.    Silvertein's statements are correct.

149.    Plaintiff's statements to the press concern the lawsuit and his research.

150.    Defendants have conceded in its letter to counsel that *neither* his lawsuit nor his

research is a permissible topic to evaluate Plaintiff.

151.    Interestingly, Plaintiff has long discussed his research and views with media,

faculty, and students, yet no "investigation" ensued and no allegations of bias were

levied by professors prior to plaintiff's AFOIA suit.

152.    For example, in 2014, Plaintiff published in the NATIONAL JURIST:

Public longitudinal data from the school in which I'm a tenured professor of law ...show a dramatic difference in bar passage rates for whites and African Americans. Multi-year data, publicly disclosed after the Arkansas Attorney General informed the school that its prior refusal to produce the material pursuant to a Freedom of Information Act request was erroneous, showed that African Americans failed the bar on their first try twice as often as whites: 40 percent versus 20 percent. My school's numbers are far from unique; indeed, they are better than some others'. And, of course, first-time bar passage rates are lower

> than lifetime rates, but first-time passage rates directly relate to the overall outcome. So, any cohort starting with a high failure rate has a steep hill to climb.
>
> The regression analysis bears out the sound instinct that race is not a predictive factor; it confounds (overlaps) with LSAT scores and undergraduate grades. In other words, the average standardized test scores and undergraduate performance differed measurably between enrolled African American and whites students, likely because schools are seeking to reflect percentages of cohort representation in the general population notwithstanding a smaller available applicant pool, which further diminishes as one moves down the hierarchy of schools. These variations predictably correlated with first-time bar passage.
>
> For those like me, who have consistently lauded the goals of affirmative action, it's most unpalatable to learn that admission preferences often harm the very underrepresented minorities these policies are designed to help.

Robert Steinbuch, "The Problem with Dumping the LSAT," National Jurist (July 31, 2014) (available at http://www.nationaljurist.com/content/problem-dumping-lsat (last visited Dec. 25, 2015)).

153.   The statements in Plaintiff's National Jurist article are true and accurate.

154.   Schwartz belittles the National Jurist as a "student magazine" when Plaintiff publishes in it, but lauds it when it gives him or Bowen positive press.

155.   It is no stretch to conclude, under the circumstances here, that Defendants' real motive for improperly redacting public records and retaliating against Plaintiff for pursuing his legal right is Defendants' collective fear that Plaintiff's research will be more widely disseminated and, the data being what they are, will give Defendant UA/UALR a black eye, because, as noted by Plaintiff:

    a.   During the six-year period covered in the school-commissioned 2012 Hanover Bar-Passage Report, Bowen admitted African Americans with a significantly lower LSAT score profile than whites. The majority of African Americans had

LSATs in the bottom quartile of the students evaluated by Hanover over a six-year period.

b. African Americans in this group failed the Bar exam at a rate twice as high as whites.

c. Bowen *never* informed students with low LSAT scores of their lower likelihood of bar passage.

d. As a result of Bowen's failure to fully inform would-be students, certain students enrolled at Bowen to their own financial detriment.

156.   Professor Steinbuch has recently discussed with press the Hanover Bar-Passage Report, commissioned by the school under a $15k funded contract, and the data that formed the basis for that report—provided only after the Attorney General rejected the University's arguments against disclosure of these documents.

157.   Bowen has refused to provide the most current bar-passage data, and, so, Plaintiff is prevented from making updated conclusions thereon; Bowen has also refused to disclose LSAT and other data on current students, thereby preventing analysis of current classes.

158.   Accusations of race bias are not remotely unique at Bowen; indeed, the American Association of Law Schools even held a session that covered some of the prior events:

Take "the case of Richard J. Peltz, a tenured high-achiever in the Bowen School of Law, University of Arkansas at Little Rock. This well-publicized case has given birth there to a new synonym for *mobbing,* namely *peltzing,* which means getting together and pummelling a professor with a barrage of aspersions and accusations toward the end of destroying the prof's good name, curtailing his or her work, and eventually eliminating the prof from the faculty…. [He] was accused of racism for [a] presentation of the affirmative action material in [his] constitutional law class. Other contentious events occurred at the law school from

2005 to 2007…[including] alleging racist conduct by [Peltz], by a faculty colleague, by student leaders of the bar association, and by student leaders of the law review[.] [Thereafter, Peltz was] denied a professorship, for which [he] was clearly qualified, and [his] co-accused colleague [] had his named professorship taken away. The lead accuser…was hired by the law school, just a year after graduation, as assistant dean of student affairs."

"Workplace Mobbing and Academic Freedom: the Socio-Economic Connections,"

2010 Annual Meeting of the Association of American Law Schools, Jan. 7, 2010

(available at http://www.kwesthues.com/AALS10.html) (last visited Dec. 27, 2015).

159.   The facts discussed in the article discussed in the previous paragraph are true and

accurate.

160.   The accuser of Peltz was Jenkins.

161.   In addition, INSIDE HIGHER ED reported:

At a 2005 faculty meeting, Peltz argued for hiring as faculty members only candidates who already have published scholarship. One of his colleagues accused him of racism because one of the job applicants for a position at the time was an African American with no published scholarship[.] [T]he university letter [ultimately clearing Peltz of all charges, and provided only after Petz filed suit] back[ed] him, saying that "nothing you did or said, particularly including the criteria you suggested for consideration of hiring applicants, was inappropriate or was motivated by race."

Scott Jaschik, "What You Can't Win in Court," Inside Higher Ed, Nov. 17, 2008

(available at https://www.insidehighered.com/news/2008/11/17/ualr) (last visited

Dec. 28, 2015).

162.   The facts discussed in the article discussed in the previous paragraph are true and

accurate.

163.   More recently, on information and belief, allegations of racial bias were again

leveled by Jenkins when a job applicant apparently did not recall having served on a

committee with her and when now former Professor Aiyetoro did not receive an award for which she had been nominated.

164. Profs. Aiyetoro's and Jenkins's emails further demonstrate that they had been speaking to Plaintiff's students and, at least in the case of Prof. Aiyetoro, that she has a demonstrable interest in seeing Plaintiff's lawsuit fail, as she disputes his prior research on the subject matter, despite the data being what they are and her ignorance of the topic generally.

165. Defendant Maxey misused her position, both as an officer of the court and as an attorney for Defendant UA/UALR, to further the other Defendants' efforts to retaliate against Plaintiff.

166. Taken as a whole, the actions of the Defendants demonstrate (1) a refusal to comply with the AFOIA and provide documents that they had provided multiple times in the past; (2) an effort to retaliate against Plaintiff for filing suit pursuant to the AFOIA by sowing discord among his classes and students; (3) baseless allegations from two rogue professors made to the two individual defendants in this suit; (4) a request that a high-ranking agent of Defendant University "investigate" these allegations; (5) improper efforts by Defendant Maxey, in her official capacity, to further the retaliation against Plaintiff under the pretextual guise of "grading policies;" and (7) individual and collective actions by Defendants to retaliate against Plaintiff for his lawsuit, free-speech, and research.

167. It is clear from this pattern of behavior that Defendants intend to continue retaliating against Plaintiff for having filed this AFOIA lawsuit, and they are willing

to do so even when specious claims, devoid of factual support or logical argument, are made by professors who have a vested interest in seeing Plaintiff's lawsuit fail.

168.    Moreover, it is clear from Prof. Jenkins' email that she wants Plaintiff to be required to grade his classes in a manner that Prof. Jenkins approves of, rather than in the manner that he has graded all previous classes, and she makes this request based on her own opinion that Plaintiff is somehow unable to grade minority students as a result of filing this AFOIA lawsuit.

169.    The Provost cleared Plaintiff of *all* wrongdoing.

170.    Aiyetoro's and Jenkins's complaints were without basis and merit.

171.    The Provost was hamstrung by Schwartz's withholding of critical information from her until Plaintiff informed her of Schwartz's prior approval of Plaintiff's grading process.

172.    Later, Plaintiff was informed by Schwartz that his annual salary increase would be below the norm for the upcoming year.

173.    When Plaintiff requested information pursuant to the AFOIA, he received a document from the Dean that stated that he gave "all-multiple-choice finals in essay courses."

174.    The only class in which Plaintiff gave a multiple-choice exam last year was Evidence. (Half the year, he served as a Fulbright Scholar in Teaching.)

175.    Even though he's an experienced academic, a tenured full professor, and a Fulbright Scholar, Plaintiff had never heard of "essay courses."

176.    As it turns out, none of his colleagues with whom he spoke ever heard of "essay courses" either.

177.  When Plaintiff requested a list of courses from the administration that are "essay courses," Schwartz said that no such document exists.

178.  Schwartz recently conducted a study of graduates who failed the Bar exam — calculating their average grade in each of the 11 non-first-year bar-related classes. Of all 11 courses, Plaintiff's Evidence class's assessment had the highest correlation with Bar performance.

179.  That wasn't the Dean's focus, though. In discussing the raise issue, rather, the Dean wrote the Acting Chancellor: "I have expertise, for which I enjoy a national reputation among legal educators, in the areas of assessment, course design, and teaching."

180.  Schwartz often tells others of his "expertise."

181.  The very notion of tenure and faculty governance, under which all legitimate institutions of higher education operate, is that after all "good" advice and consultation, the professor decides the appropriate course of action in educational decisions.

182.  The Dean informed the Acting Chancellor that his "approach gives each faculty member the academic freedom to decide whether he wishes to follow his preferences or receive a better raise."

183.  So, the argument seems to be: you have academic freedom, you just have to pay for it — literally. By this logic, the Dean could charge faculty a fee for certain disfavored political views, as well, because any faculty would have the "academic freedom to decide whether he wishes to follow his preferences or receive a better raise."

184. The University's Provost and Acting Chancellor corrected the Dean.

185. Plaintiff's raise, as well as those of most of the law faculty, were increased by the Acting Chancellor.

186. The Acting Chancellor reprimanded Schwartz for his actions.

187. Schwartz's actions were improper.

188. That reprimand was proper and justified.

189. Schwartz's articulated basis for a reduced raise was pretextual.

190. Schwartz offered the reduced raise to Plaintiff in retaliation for his protected activities. Schwartz's actions are malicious.

191. Schwartz privately characterized the Acting Chancellor as "irrational" prior to testifying in Court, wherein he spoke glowingly of her.

192. The Acting Chancellor is not "irrational." Schwartz is wrong.

193. Plaintiff is personally familiar with Schwartz's duplicity: Schwartz told Plaintiff during an annual evaluation that he, Schwartz, would cross out of the draft evaluation the material in which Schwartz improperly criticized Plaintiff for having a low participation rate on his student evaluations. After Plaintiff described the process at Bowen, Schwartz agreed that Plaintiff does not control the participation, and Schwartz explicitly agreed to cross out the paragraph in the evaluation regarding the issue, as well as the reference to the same in a sentence in the conclusion. Schwartz then reneged on his pledge and repeatedly denied ever having made the pledge.

194. Schwartz's reneging was intentional and knowing.

195. Schwartz actively sought support against the Acting Chancellor from among the law-school faculty. And he sought to communicate with the incoming Chancellor to sow discord between him and the Acting Chancellor.

196. When Plaintiff's mother exhibited very concerning medical symptoms, he immediately contacted the administration to alert them to the possibility of a need to find coverage for his classes. He was not required to do so, but he did so for the benefit of the students and the school.

197. Plaintiff kept the administration informed as he received more information, every step of the way. He was not required to do so, but he did so for the benefit of the students and the school.

198. Plaintiff sought leave under FMLA.

199. Plaintiff received leave under FMLA.

200. When Plaintiff's need for leave became more evident, he informed his students of what he had already told the administration. He was not required to do so, but he did so for the benefit of the students and the school.

201. When Beiner contacted Plaintiff twice, separately seeking his respective syllabi, he promptly provided them -- even while at the hospital, notwithstanding that the school already possessed that material. Plaintiff also provided copies of all the hand-selected materials that he uses in his Law & Medicine class, for which he created his own reader. He was not required to do so, but he did so for the benefit of the students and the school.

202. The Acting Chancellor appreciated aforedescribed efforts for the benefit of the students and the school.

203.   Apparently, however, Beiner not only never provided any information to the

students – and she was unable to answer their very basic questions about class

coverage and book purchases.

204.   Beiner wrote Plaintiff:

> Several students in your fall classes have brought to my attention that you sent
> them an email informing them that you would not be teaching for part or all of the
> fall semester. I'd appreciate it if, in the future, you would let my office handle any
> announcements that are made with respect to changing professors, times or days
> of classes. As a result of your emails, I had several students email me and stop me
> in the halls concerned about the status of their class or the books they bought for
> the class. It would have been better for the students and the school if my office
> had made contact after your leave was officially approved so that we could give
> the students as complete information as possible about their classes (which would
> result in less stress to them).
>
> I'd appreciate your cooperation with this in the future. It also would have been
> helpful if you had copied me on your email to students so that I wasn't forced to
> guess as to its contents.

205.   Any competent administrator should know to tell students that the classes will be

covered and the same book will be assigned or their book purchases will be refunded.

206.   Plaintiff responded:

> I would appreciate if you not email me such a remarkably offensive email in the
> future.  I realize that this administration has a very generous view of its abilities,
> but I am a professor.  And you will not filter my apt communications with my
> classes.
>
> In fact, my efforts were designed to provide information to students to reduce
> their stress. I'm confident that I achieved that goal during this time of uncertainty.
> Moreover, I'm surprised that you hid this important information from my students.
>
> What's even more noteworthy is the apparent inconsistency.  You previously you
> went behind my back to interview my student about the contents on my class.
> You never informed me of this fact.  In contrast, here, I told the students exactly
> what I told you -- and only after informing you.
>
> I recommend you more seriously consider the propriety of your words to a
> professor in the future.

207.    Schwartz responded:

> I am writing you privately to address two issues. First, the tone of your message
> to Dean Beiner is unacceptably disrespectful. In your future emails to her, I am
> directing you to exhibit the respect due her position at the law school.
>
> Second, Terri was communicating an approach I expect you to comply with if the
> issue ever arises again. At the very least, you should have copied her on your
> message so she would have known that students would be likely to come to her
> with concerns.

208.    Schwartz believes that Plaintiff doesn't have academic freedom and can be treated

like an employee-at-will.

209.    Written documents don't have a tone.

210.    Nothing in Plaintiff's email was vulgar or profane.

211.    Schwartz's objection to Plaintiff's email was, in fact, an objection to its contents –

its substance.

212.    Since Schwartz understands that he cannot restrict the substance of Plaintiff's

comments, he transparently attempted to couch his complaint as one of "tone."

213.    Since there is no tone, and since there is nothing objectionable in Plaintiff's email,

Schwartz's actions are pretextual and malicious.

214.    Defendants contend in this lawsuit that Beiner is not Plaintiff's supervisor and has

no supervisory authority over him. If true, she shouldn't even be communicating

with Plaintiff about such matters.

215.    Schwartz and Beiner are not empowered to direct Plaintiff not to communicate

with his classes about matters affecting the classes.

216.    Plaintiff exercised his right to express opinion under the First Amendment and the

policy of academic freedom set forth in University of Arkansas Board of Trustees

Policy 405.1, Tenure, § A13, which provides, in pertinent part:

*Mere expressions of opinions, however vehemently expressed and however controversial such opinions may be, shall not constitute cause for dismissal.* The threat of dismissal will not be used to restrain faculty members in their exercise of academic freedom or constitutional rights.

217.  Schwartz fails to understand the University's policy, believing that he can treat

Plaintiff as his personal employee, rather than a tenured professor employed by the

State of Arkansas and specifically protected against the individual whims of

misguided administrators believing that they can treat the University and its faculty as

their own personal business or fiefdom and employees, respectively.

218.  Schwartz supports the American Association University Professors (AAUP)

statements and has cited them in faculty evaluations.

219.  The AAUP Statement On Collegiality as a Criterion for Faculty Evaluation reads:

Historically, "collegiality" has not infrequently been associated with ensuring homogeneity, and hence with practices that exclude persons on the basis of their difference from a perceived norm. The invocation of "collegiality" may also threaten academic freedom. In the heat of important decisions regarding promotion or tenure, as well as other matters involving such traditional areas of faculty responsibility as curriculum or academic hiring, collegiality may be confused with the expectation that a faculty member display "enthusiasm" or "dedication," evince "a constructive attitude" that will "foster harmony," or display an excessive deference to administrative or faculty decisions where these may require reasoned discussion. Such expectations are flatly contrary to elementary principles of academic freedom, which protect a faculty member's right to dissent from the judgments of colleagues and administrators.

A distinct criterion of collegiality also holds the potential of chilling faculty debate and discussion. Criticism and opposition do not necessarily conflict with collegiality. Gadflies, critics of institutional practices or collegial norms, even the occasional malcontent, have all been known to play an invaluable and constructive role in the life of academic departments and institutions. They have sometimes proved collegial in the deepest and truest sense. Certainly a college or university replete with genial Babbitts is not the place to which society is likely to look for leadership. It is sometimes exceedingly difficult to distinguish the constructive engagement that characterizes true collegiality from an obstructiveness or truculence that inhibits collegiality. Yet the failure to do so may invite the suppression of dissent. The very real potential for a distinct

criterion of "collegiality" to cast a pall of stale uniformity places it in direct tension with the value of faculty diversity in all its contemporary manifestations.

220.   Schwartz supports the above statement from the AAUP.

221.   Schwartz's actions are inconsistent with AAUP standards.

222.   Plaintiff is free, *inter alia*, to inform Beiner and Schwartz, as well as others, that he believes that Beiner and Schwartz are not well suited to perform their jobs and that the students and school would be better off without them in their positions.

223.   Beiner and Schwartz are not well suited to perform their jobs and that the students and school would be better off without them in their positions.

224.   Plaintiff is free to tell Beiner and Schwartz that they are violating Academic Freedom.

225.   Plaintiff is free to tell Beiner and Schwartz that they are violating Plaintiff's rights.

226.   Plaintiff is free to tell Beiner and Schwartz that they are violating AAUP guidelines.

227.   Plaintiff is free to tell Beiner and Schwartz that they are violating Academic Freedom.

228.   Plaintiff is free to tell Beiner and Schwartz that he "would appreciate [that they] not email [him] such a remarkably offensive email in the future."

229.   Plaintiff is free to tell Beiner and Schwartz that he "realizes that this administration has a very generous view of its abilities, but [he is] a professor."

230.   Plaintiff is free to tell Beiner and Schwartz that they "will not filter [his] apt communications with [his] classes."

231.   Plaintiff is free to tell Beiner and Schwartz that his "efforts were designed to provide information to students to reduce their stress. [He's] confident that [he] achieved that goal during this time of uncertainly. Moreover, [he's] surprised that [Beiner] hid this important information from [his] students."

232.   Plaintiff is free to tell Beiner and Schwartz "What's even more noteworthy is the apparent inconsistency. [Beiner] previously you went behind [Plaintiff's] back to interview [his] student about the contents on [his] class. [Beiner] never informed me of this fact. In contrast, here, [Plaintiff] told the students exactly what [Plaintiff] told [Beiner] -- and only after informing [Beiner]."

233.   Plaintiff is free to tell Beiner and Schwartz that he "recommend[s] [they] more seriously consider the propriety of [their] words to a professor in the future."

234.   Schwartz is attempting to infringe Plaintiff's Academic Freedom by restricting Plaintiff's legitimate speech. Such a claim here is a transparent attack on Academic Freedom, and Plaintiff is not subject to the same notions of insubordination as an at-will non-academic employee.

235.   UALR is a public institution of higher education, which differs greatly from either private or non-academic institutions.

236.   Plaintiff is further entitled to tell Beiner and Schwartz that they are overstepping their bounds.

237.   Steinbuch responded to Schwartz:

> As I stated clearly and accurately, Dean Beiner's email was highly offensive and unprofessional. Yours is only somewhat less so. I will not accept such behavior simply under the mistaken belief that an administrative position entitles such abuse. I am a Professor and expect the professionalism from your staff to which I'm entitled -- but haven't received.

Second, I have no intention of having my communication with my classes pre-screened by the administration. I'm sorry that Dean Beiner feels that keeping the students informed is a bad approach. I will communicate with my students when they need to be informed.

Third, had Dean Beiner simply asked to be copied in the future, I would have happily answered with one word: "absolutely." That is not, however, what her inappropriate email said.

Your administration has repeatedly modeled unprofessional behavior. I'm sorry that you don't like to hear this, but I recommend you address that rather than attacking me.

238.    Plaintiff, as a tenured faculty member, is free to send the above email to Schwartz.

### Claim I: Violation of the AFOIA

239.    Plaintiff restates and reasserts the facts, contentions, and allegations contained in paragraphs 1 through 238, *supra*, as if set out word for word herein.

240.    Plaintiff, like any citizen of the State of Arkansas, has a right to receive public records from UA/UALR upon request, with the obvious caveat that any exempt information shall be excluded from the records that are provided. *See* Ark. Code Ann. § 25-19-105(a)(1)(A); Ark. Code Ann. § 25-19-105(f); *see generally Hopkins v. City of Brinkley*, 2014 Ark. 139, 432 S.W.3d 609.

241.    Defendants UA/UALR and Schwartz have not established that any exemption applies to the requested records that would allow the redaction of the "Ethnicity," "LSAT," and/or "LGPA" information; more to the point, as a matter of law, none of the information in the "Ethnicity," "LSAT," or "LGPA" columns was exempt information under the AFOIA.

242.   Accordingly, Defendant UA/UALR and Schwartz's failure to provide the
       requested records in a format that includes all non-exempt information is a violation
       of the AFOIA, for which Plaintiff is entitled to relief from this Court.

243.   None of the reasons proffered by Schwartz amount to substantial justification for
       Defendants' failure to comply with the AFOIA, inasmuch as:

       a.   The admissions practices are such that nobody could possibly recall a specific
            LSAT/GPA combination that would allow identification of specific students,
            as admissions committee members are not provided with a list of attending
            students that contains LSAT scores and undergraduate GPAs once an
            admission decision is made.

       b.   Defendant Schwartz's position is not only contrary to his previous release of
            the same categories of information in 2013 (which he now claims violated
            State and Federal law), but it is also contrary to Professor Watkins' treatise
            and the most relevant Attorney General's opinion on the matter.

244.   Most importantly—and ultimately fatal to any argument of substantial
       justification for Schwartz's position—the analysis for release of records pursuant to
       FERPA does not turn on whether Plaintiff, in his particularized position as a former
       member of the admissions committee, might identify a specific student, but whether
       the information would allow "a reasonable person in the school community, *who does
       not have personal knowledge of the relevant circumstances*, to identify the student
       with reasonable certainty." 34 C.F.R. § 99.3 (emphasis added); *see also* Ark. Op.
       Att'y Gen. 2013-027 ("a requester's identity—and, a fortiori, his or her unique

expertise or knowledge—is generally irrelevant to assessing the custodian's disclosure obligations").

### Claim II: Violation of the WBA

245.   Plaintiff restates and reasserts the facts, contentions, and allegations contained in paragraphs 1 through 238, *supra*, as if set out word for word herein.

246.   Plaintiff, as a professor at UALR's Bowen School of Law, is a "public employee" as that term is used in the WBA. *See* Ark. Code Ann. § 21-1-602(4).

247.   Defendant UA/UALR, as a public university, is expressly a "public employer" vis-à-vis Plaintiff as that term is used in the WBA. See Ark. Code Ann. § 21-1-602(5)(B).

248.   Defendant Beiner, as Associate Dean of Academic Affairs at Bowen, is an agent of Defendant UA/UALR, and her actions in this matter were done at the direction, behest, acquiescence, and/or urging of UA/UALR.

249.   Because Defendant Beiner had not contacted Plaintiff's students regarding Plaintiff's research until after Plaintiff's original Complaint, which sought records relevant to his research, was filed, her contacting of the students is retaliatory on its face.

250.   Defendant Beiner's contacting of a minority student specifically to ask him if Plaintiff had discussed his research regarding minority students is an "adverse action" as that term is used in the WBA, inasmuch as her contact was an effort to "otherwise discriminate or retaliate against a public employee in any manner that affects the employee's employment." Ark. Code Ann. § 21-1-602(1).

251.    Defendant Beiner's actions have affected Plaintiff's employment by sowing discord among the students, attempting to undermine Plaintiff's credibility with certain segments of the student population, and insinuating that something improper or untoward is behind Plaintiff's research.

### Claim III: Violation of Ark. Code Ann. § 21-1-503(c)(1)

252.    Plaintiff restates and reasserts the facts, contentions, and allegations contained in paragraphs 1 through 238, *supra*, as if set out word for word herein.

253.    Ark. Code Ann. § 21-1-503(c)(1) makes it "unlawful for any public employer to discipline, to threaten to discipline, to reprimand either orally or in writing, to place any notation in a public employee's personnel file disciplining or reprimanding the public employee, or to otherwise discriminate against a public employee because the public employee exercised the right to communicate with an elected public official or exercised a right or privilege under the" AFOIA.

254.    Plaintiff, as a professor at Bowen, is a "public employee."

255.    Defendant UA/UALR is a "public employer," and the individually named Defendants are agent, representatives, or persons otherwise acting on behalf of UA/UALR, whose actions in this matter have been done at the direction, behest, acquiescence, and/or urging of UA/UALR.

256.    Defendants' actions, individually and collectively, in opening an investigation into Plaintiff, threatening discipline if Plaintiff does not comply, and seeking to compel Plaintiff to be subject to interrogation discriminates and/or retaliates against Plaintiff based upon his AFOIA lawsuit. Defendants actions have affected Plaintiff's

employment by sowing discord, attempting to undermine Plaintiff's credibility, and insinuating that something improper or untoward is behind Plaintiff's research.

### Claim IV:  Violation of Article 2 Section 6 of the Arkansas Constitution

257.   Plaintiff restates and reasserts the facts, contentions, and allegations contained in paragraphs 1 through 238, *supra*, as if set out word for word herein.

258.   Beiner, Schwartz, and UALR have violated Plaintiff's Free-Speech and related rights.

### Claim VI:  Violation of the U.S. Constitution's First Amendment

259.   Plaintiff restates and reasserts the facts, contentions, and allegations contained in paragraphs 1 through 238, *supra*, as if set out word for word herein.

260.   Beiner, Schwartz, and UALR have violated Plaintiff's Free-Speech and related rights.

### Claim V:  Violation of Academic Freedom

261.   Plaintiff restates and reasserts the facts, contentions, and allegations contained in paragraphs 1 through 238, *supra*, as if set out word for word herein.

262.   Beiner, Schwartz, and UALR have violated Plaintiff's Academic Freedom and related rights.

### Claim VII:  Tortious Interference With Employment Contract

263.   Plaintiff restates and reasserts the facts, contentions, and allegations contained in paragraphs 1 through 238, *supra*, as if set out word for word herein.

264.   Beiner, Schwartz, and UALR have tortuously interfered with Plaintiff's tenure-contract and related rights.

### Prayer for Relief

265.     Plaintiff is entitled to a hearing on the AFOIA aspect matter. *See* Ark. Code Ann. § 25-19-107(b); *see also Orsini*, 340 Ark. 665, 13 S.W.3d 167.

266.     Plaintiff waives the seven-day requirement under Ark. Code Ann. § 25-19-107(b) to the extent it is read to require a hearing to be held within seven days from the date of filing.

267.     Plaintiff asserts that one or more depositions might possibly be needed in this matter.

268.     Plaintiff, through undersigned counsel, will seek reasonable attorney's fees and costs from the Arkansas Claims Commission upon successful completion of the AFOIA component of this matter, as well as any other component of this case for which he may seek reasonable attorney's fees and costs from the Arkansas Claims Commission. *See* Ark. Code Ann. § 25-19-107(e)(2)(B).

269.     Plaintiff, through undersigned counsel, reserves the right to seek reasonable attorney's fees and costs from Defendant UA/UALR and/or other individually named defendants upon successful completion of the WBA component of this matter. *See* Ark. Code Ann. § 21-1-605(5).

WHEREFORE the Plaintiff, Robert Steinbuch, prays that this Court will hold a hearing and enter an Order finding: (1) Defendants UA/UALR and Schwartz violated the AFOIA through improper redaction of requested records; (2) Defendants UA/UALR and Schwartz were not substantially justified in their refusal to provide the records as requested; (3) Plaintiff is entitled to unredacted copies of the requested records; (4) Defendants UA/UALR, Schwartz, Beiner, and Maxey violated the WBA and AFOIA anti-retaliation statutes through retaliatory actions against Plaintiff that were taken as a result of his filing the original and amended

Complaints in this matter; (5) Defendants UA/UALR, Schwartz, and Beiner violated Plaintiff's First Amendment, Article 2 Section 6 of the Arkansas Constitution, Academic Freedom, and tortiously interfered with Plaintiff's employment contract; (6) Beiner and Schwartz acted with malice; (7) Plaintiff is entitled to injunctive relief, actual damages where legally permitted and appropriate, and attorney's fees and costs from the Claims Commission; (8) Plaintiff is entitled to any and all such additional relief as is necessary and proper.

Respectfully Submitted,

*/s/Chris P. Corbitt*
Chris P. Corbitt, Ark Bar #2004089
Corbitt Law Firm, PLLC
PO Box 4368
Little Rock, AR 72214
Telephone (501) 907-2727
FAX (888) 838-9096
www.corbittlawfirm.com
Email: chris@corbittlawfirm.com

By /s/ Chris P. Corbitt
Chris P. Corbitt, Ark. Bar No. 2004089
Attorney for Robert Steinbuch

## CERTIFICATE OF SERVICE

I, Chris P. Corbitt hereby certify that I electronically filed the foregoing with the Clerk of the Court using the Arkansas Judiciary's eFLEX electronic filing system and served via email a copy to the following on August 19, 2016.

David A. Curran
University of Arkansas System
2404 North University Arkansas Avenue
Little Rock, AR 72207-3608
Email: dcurran@uasys.edu
Email: sjames@uasys.edu

/s/ Chris P. Corbitt
Chris P. Corbitt

*Steinbuch – Fourth Amended Complaint*
*Page 48 of 48*